IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Jordan Whitaker (M-30265), ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 18 C 50373 |
| v. ) | |
| ) | Judge Philip G. Reinhard |
| Officer Michael Dempsey, ) | |
| Lieutenant Brandt Boel, ) | |
| and Officer Michael Castenado ) | |
| ) | |
| Defendants. ) | |

## ORDER

Defendants' motion for summary judgment [124] is granted, and judgment is granted to defendants on all counts. This case is closed.

## MEMORANDUM OPINION

Plaintiff Jordan Whitaker is an inmate at Dixon Correctional Center ("Dixon") serving a long sentence for aggravated criminal sexual assault with a weapon and home invasion.[1] Throughout his life, and while incarcerated at Dixon, plaintiff has struggled with mental illnesses. He has a history of harming himself, often by cutting the crook of his elbow, a region sometimes referred to in medical parlance as the antecubital space. This lawsuit is about two such incidents that took place, a week apart, in August 2018. The first was on August 9th, and the second was on August 16th. Plaintiff, who proceeded *pro se* initially, alleges that Dixon correctional officers did not act promptly to stop him from cutting himself and then delayed in getting him treatment after he did so. Plaintiff filed two *pro se* complaints, one for each incident. After screening these complaints and dismissing some claims and defendants, this court appointed counsel to represent plaintiff. Counsel then filed an amended complaint, combining the two actions and further dropping some of plaintiff's original allegations. The amended complaint names only three correctional officers as defendants and asserts two § 1983 claims (excessive force and failure to protect). Now before the court is defendants' motion for summary judgment.

The parties disagree about what happened in each incident. According to plaintiff, the same basic scenario unfolded each time. He was in a crisis watch cell in the psychiatric unit. A correctional officer conducting 15-minute rounds came by to check on him. Plaintiff told the officer (Dempsey in the first incident, Castenado in the second) that he needed to see a crisis counselor and then threatened to harm himself if his request were not immediately met. Plaintiff further alleges—and this allegation is at the heart of this case—that he held up a sharp piece of

---

[1] He has a projected parole date of February 7, 2058. *See* IDOC website.

metal each time, making it clear that his self-harm threat was serious. Since plaintiff was in a crisis watch cell whose main purpose was to prevent inmates from having implements of self-harm, plaintiff's brandishing of a sharp object would have presumably been a surprising occurrence. Even though plaintiff was threatening self-harm, the officer in each case allegedly refused to get a crisis counselor right away and also allegedly used dismissive language saying in effect that they did not care about plaintiff's troubles (*e.g.* Dempsey allegedly telling plaintiff to "fuck off" and saying: "I don't give a shit you're not hurting me you're hurting your damn self."). [1 at p. 8.] Plaintiff then cut himself. Allegedly, the officers just stood by for another five minutes or so after plaintiff cut himself, and then after this pause, called for medical help. Plaintiff's injuries turned out to be relatively minor, all things considered, although he believes this benign outcome was basically due to luck and that his injuries could have been more serious, even life-threatening.

The August 9th incident has another component to it. Plaintiff alleges that, when additional officers and medical personnel came to his cell after Dempsey called for assistance, one of those officers (defendant Brandt Boel) pepper-sprayed plaintiff because he was allegedly not cooperating with the nurses and was flailing his arms causing blood to spatter on people. Plaintiff denies this allegation and states that he was cooperative throughout the encounter.

Defendants tell a different story. Because the court concludes (as explained below) that plaintiff cannot prevail on his claim based on the August 16th incident and because the court believes that his claim based on the August 9th incident is the stronger one, the court will focus the discussion on that incident. According to defendants, when Dempsey was making rounds and came by plaintiff's cell, plaintiff was already on the floor of his cell bleeding. Here is how Dempsey described the scene in his affidavit: "At approximately 9:00 p.m. on August 9, 2018, I observed inmate Whitaker on the floor of his cell with blood in his immediate area. He appeared to be self-injuring. I directed inmate Whitaker to stop injuring himself, but he did not respond or comply with my order." [126-10 at ¶¶ 6-7.] Dempsey then immediately called his supervisor, Boel. Dempsey states that he was not allowed by prison rules to go into the cell by himself, no matter how serious the bleeding may have been, but had to wait for his supervisor. In this first phase of the encounter, the only evidence for what happened comes from Dempsey and plaintiff.

In the next phase, Boel arrived at the cell, followed by several other guards and nurses. The primary source of evidence for what happened in this phase is Boel's affidavit, but the recollections of the other participants are set forth in the IDOC internal investigation report (Ex. 6), and their recollections generally confirm Boel's description. Boel states that, when he arrived, plaintiff was lying on the floor of this cell. There was blood on the floor and walls. Boel ordered plaintiff to move to the cuffing port to be handcuffed, but plaintiff did not respond. The cell door was opened and guards put plaintiff in mechanical hand restraints. Boel applied pressure to plaintiff's wound to control the bleeding while waiting for nurses to arrive. Once the nursing staff arrived, Boel moved out of the way to allow them to treat plaintiff. Plaintiff was combative and refused treatment. He waved his arms, preventing the nurses from dressing his wound and also causing blood to get on the people there. Boel directed plaintiff to stop flailing his arms and warned him that he would be pepper-sprayed if he did not calm down. He did not comply, and was sprayed once in the face, at which point he became compliant. Plaintiff admits that his blood somehow got

on staff members, including Boel, but denies that he deliberately caused blood to be sprayed on anyone or that he was uncooperative during the encounter.

Before turning to the legal analysis, one other issue looms large in the background and must be acknowledged. Although this case involves just two incidents of self-harm, defendants have submitted records describing plaintiff's many other incidents of self-harm while at Dixon. Defendants believe that this history shows that plaintiff engages in self-harm to achieve what psychologists sometimes refer to as "secondary gain." *See Scruggs v. Sims*, 2020 WL 7711349, *6 (S.D. Ind. Dec. 29, 2020) ("'Secondary gain' is when a suicidal patient's self-injurious behavior is done for a reason other than suicide. Suicide attempts are thus a pretextual reason to obtain something else."). Stated more bluntly, defendants essentially believe that plaintiff has a tendency to lie and manipulate, and that this is just what he was doing in these two incidents and is even what he is doing now in prosecuting this lawsuit.

The exhibits submitted by defendants provide support for these contentions. It is undisputed that plaintiff has repeatedly engaged in self-harm while at Dixon, both before and after these two incidents. In at least some of these cases, he cut himself to achieve secondary gains, rather than to genuinely attempt suicide. This conclusion is based on plaintiff's own admissions after some of these incidents. He has admitted to manipulating and exaggerating to try to get things he wanted.[2] Defendants' exhibits also document many instances in which plaintiff was uncooperative and aggressive when interacting with prison officials and even outside medical providers. *See, e.g.*, Ex. A at p. 17 ("On 1/28/18 at NRC, he threw feces on a security staff Lt. He impaired surveillance, was insolent, had contraband, threatened to throw 'shit' and 'piss' in the face of the officer, masturbated, popped the sprinkler, sprayed blood on a Sgts clothing."); Ex. A at 8 (on August 2, 2018, just a week before this first incident, medical officials noted that plaintiff was "aggressive, argumentative, threatening, [and] unsafe to approach"). He has been disciplined many times, often for disobeying orders from guards. *See* Ex. 12 (disciplinary card listing numerous violations including many instances of disobeying orders). He has been diagnosed with multiple psychiatric conditions, one of which is antisocial personality disorder. As the Seventh Circuit has observed, people with this disorder tend to lie and manipulate those around them. *United States v. Wilbourn*, 778 F.3d 682, 683 (7th Cir. 2015) ("Persons afflicted with [antisocial personality disorder] 'tend to antagonize, manipulate or treat others either harshly or with callous indifference. They may often violate the law, landing in frequent trouble, yet they show no guilt

---

[2] Many examples could be culled from defendants' exhibits. Here is only a partial list. *See* Ex. A at p. 15 ("Mr. Whitaker has been firm in stating that these recent 'cutting' incidents are not intended suicides, but rather an acting out of high level frustration."); *id.* at p. 17; ("there is an account of a CO overhearing [plaintiff] tell other inmates that he intended to claim mental illness in an attempt to influence his court case. The reported hallucinations or delusions failed to be exhibited or noted subsequently."); *id.* at p. 18 ("Previous reports indicate [that] staff felt many of Mr. Whitaker's actions were to obtain secondary gains."); *id.* at p. 18 ("After his return from KSB Hosptial [sic] on 7/11/20, he indicated to BHT Lyndell Fischer that he engaged in self-harm to 'get air conditioning in the X house, to get involved in groups and to be put in school.'"); *id.* at p. 22 (on 6/26/18: "I/M had been observed coaching another I/M (Simmons) regarding behaviors to exagerated [sic] symptoms to achieve already stated goal by I/M Simmons to be transfer[red]"). However, it should also be noted that plaintiff sometimes stated after the incident that he was genuinely trying to commit suicide. *See, e.g., id.* at 18.

or remorse. They may lie, behave violently or impulsively, and have problems with drug and alcohol use.'") (quoting the Mayo Clinic online manual).

The court believes that this background evidence would make it very difficult for plaintiff to convince a jury both that he is telling the truth and that numerous prison and medical officials are all lying in unison (which is what his theory presupposes). In short, to borrow a proverb, he would likely face a boy-who-cried-wolf problem. At the same time, the court acknowledges that plaintiff still believes that, even if his mental illnesses caused him to lie and manipulate on some occasions, it is still possible he is telling the truth about what happened in these two particular incidents. Plaintiff also suggests that, however unlikely it may seem, prison officials could have engaged in what is basically a broad conspiracy to create false (or exaggerated or distorted) accounts of plaintiff's behavior over a multi-year period. Plaintiff, however, has offered little direct evidence for these conspiracy-type allegations, and he does not deny many of the facts set forth in defendants' exhibits. And on a more general level, he agrees that he has engaged in aggressive behavior and that he is not, in his own words, a "model inmate," a fact he blames on his mental illnesses. Still, on balance, the court does not believe that defendants' arguments about plaintiff's general tendencies and predispositions are by themselves valid grounds for granting summary judgment, especially given the requirement that all reasonable inferences must be construed in plaintiff's favor.

## **ANALYSIS**

The general legal framework was set forth in this court's screening order. To state a claim of deliberate indifference, a prisoner must allege: (1) an objectively serious medical condition and (2) deliberate indifference on the part of the defendant prison official. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). In the context of self-harming incidents, "prison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012); *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006) (defendant "must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life").

The court will now turn to the two incidents, beginning with the August 16th incident, which can be resolved in fairly short order. Although defendants question whether plaintiff ever had a metal object and even question whether defendant Castenado was at plaintiff's cell that night, their main argument for summary judgment is that the cut on plaintiff's harm was too minor to allow for recovery under § 1983, even if all of plaintiff's allegations are taken as true. This court agrees.

This argument is strongly supported by the Seventh Circuit's fairly recent decision in *Lord v. Beahm*, 952 F.3d 902 (7th Cir. 2020), a case involving a similar scenario. There, an inmate, who was going to be written up by a guard for a disciplinary violation, yelled to the guard that "he had a razor blade and intended to kill himself." *Id.* at 903. The guard ignored the threat and walked away. The inmate then cut himself. The inmate brought a § 1983 action against four guards, alleging that they created "a material risk to his life by not responding faster to his suicide threat." *Id.* The district granted summary judgment to defendants. On appeal, the Seventh Circuit affirmed,

4

first noting that correctional officers have a duty "to respond to and mitigate a meaningful risk of inmate suicide." *Id.* at 904. But the Seventh Circuit then characterized this particular inmate's act of cutting himself with a razor blade as an "insincere suicide threat to get attention." *Id.* at 904-05. The Seventh Circuit held that the district court was correct in granting summary judgment because the inmate had failed to "develop[] evidence of a recoverable injury." *Id.* at 905. His physical injuries "consisted only of minor scratches, quickly and easily treated with a gauze bandage," and the inmate "supplied no evidence that he suffered any other form of injury (for example, psychological harm) from his insincere suicide thereat." *Id*.

The same analysis applies here. The facts are undisputed. After plaintiff cut himself, a nurse came to the cell to treat his wound, but plaintiff refused *any* treatment. He has was not taken to the hospital, and he has not alleged that he suffered any other problems from the cut he inflicted on himself. Thus, under *Long*, summary judgment should be granted to defendants on this part of plaintiff's claims. *See also Flemming v. Breen*, 2020 WL 4700911, *4 (E.D. Wisc. Aug. 13, 2020) (granting summary judgment based on *Lord*: "The court finds that no jury could reasonably conclude that Flemming posed a risk of serious harm to himself even though he possessed a razor. [] Flemming presents no evidence to support a conclusion that this form of coping—although self-destructive—placed him in grave or serious danger, and courts have consistently held that minor cuts are not objectively serious."); *Jones v. Menning*, 2018 WL 2860045, *2 (E.D. Wisc. June 11, 2018) (granting summary judgment because suicide attempts by cutting with tiny pieces of metal were minor cuts that were treated with disinfectant and bandages and were thus not objectively serious).

The court next turns to the August 9th incident, which requires a longer and more fact-intensive analysis. Here, questions also could be raised about the seriousness of the injury. By the time plaintiff got to the hospital, the bleeding had stopped, and he received only a modest amount of stitches and was returned to Dixon a few hours later with no apparent long-term complications. However, the court does not believe that the injuries were so minor as to fit within the *Long* holding. Both sides agree that the volume of bleeding was fairly significant. There was blood on the walls and floor, and defendants' justification for pepper-spraying plaintiff is that he was causing blood to spatter on people. This is enough to show the injury was serious. As for the legal duties, defendants do not contest the proposition that Dempsey was obligated to seek help if plaintiff made a credible suicide threat. They also agree that Dempsey was required to promptly summon help once plaintiff cut himself and was bleeding heavily. And it is undisputed that Dempsey did *eventually* call Boel who promptly responded.

What is in dispute are three primary issues. The first is whether Dempsey saw plaintiff hold up a metal object and threaten to harm himself. Defendants deny this allegation, asserting that Dempsey first came upon plaintiff when he was on the floor *already* cutting himself. Additionally, defendants do not believe plaintiff ever had any object, metal or otherwise. Dempsey never saw any object, and after plaintiff was taken out of his cell, defendants searched the cell and did not find any "cutting instrument." Ex. 10 at ¶ 15.[3] None of the other witnesses who came to the cell,

---

[3] Despite some quibbling by plaintiff, this fact is undisputed. Specifically, plaintiff has not denied that a search was conducted and that no object was found. However, plaintiff tries to indirectly cast doubt on the search by speculating

including Boel, saw any object lying around. It should be remembered that plaintiff was in a crisis watch cell, which as plaintiff himself notes, is "furnished to deny the inmate with implements, such as bedsheets, razors, knives or other sharp metal objects" that might be used in a suicide attempt. Am. Cmplt. ¶ 7(b). One might wonder how plaintiff could cut himself if there were no object. Defendants believe that plaintiff scratched an old wound, perhaps with his fingernails. A week earlier, on August 2nd, plaintiff cut himself and received stitches in the same antecubital region where he cut himself on August 9th. Plaintiff also had a history of cutting himself without using any metal objects. *See* Ex. A at p. 12 (plaintiff "reported cutting his right [elbow region] with his toenail").

The second issue is whether Dempsey, after seeing that plaintiff had cut himself, waited five minutes before calling Boel (as plaintiff alleges) or whether he called Boel right away (as defendants allege).

The third issue is whether Boel was justified in pepper-spraying plaintiff because he was flailing his arms, causing blood to spatter on people, and because he was refusing to obey Boel's order to stay still (as defendants allege) or whether plaintiff was docile and compliant (as he alleges).

In sum, this case boils down to three key disputes. In each case, the only evidence plaintiff has offered is his own recollection. Defendants, in turn, are relying firstly on the recollections of the two initial officers (Dempsey and Castenado) but also on the recollections of multiple other witnesses as well as documentary evidence.

In most cases, this type of "he said-he said" dispute would readily be given to a jury to sort out. But in this case the court concludes that plaintiff's version of what happened is so flawed and so self-contradictory that this is one of those rare cases where summary judgment is appropriate in this type of scenario.

To explain why requires a closer look at how plaintiff's allegations have changed over this lawsuit. The biggest point of contention concerns the metal object plaintiff allegedly used to cut himself. Before considering that topic, the court will discuss the alleged five-minute delay. Plaintiff's allegation is vague. He appears to be claiming that, after he cut himself, Dempsey did nothing for five minutes. But plaintiff has not explained what Dempsey was doing during this time. Plaintiff has not alleged that Dempsey walked away, which is a scenario seen in some cases such as *Long*. So presumably Dempsey was just standing there continuously for five minutes. Plaintiff does not allege that Dempsey said anything during this time either. It would seem odd, though not inconceivable, that a guard would just stand there, hovering, doing nothing. Plaintiff also has not offered any theory as to why Dempsey would have been motivated to act this way.[4] And even

---

that it may have been "woefully inadequate" or not "properly documented." [138 at p. 8.] But these speculations are not sufficient to put this fact in dispute under Rule 56.

[4] The closest plaintiff comes to suggesting a motive is when he states in his response brief that Boel (not Dempsey) may have had a "desire for revenge" against plaintiff given plaintiff's manipulative and aggressive history with guards. [138 at p. 5.] Put aside the fact that this theory implicitly accepts defendants' characterization of plaintiff as a manipulator, this theory is speculative. No evidence has been offered to support it. Finally, plaintiff has only suggested that Boel had this desire for revenge and has not explicitly tied it to Dempsey.

assuming Dempsey had ill will and wanted to punish plaintiff, the fact remains that Dempsey did call for help, and plaintiff's wound was successfully treated.

Another aspect to consider is that this allegation was not included in plaintiff's two initial *pro se* complaints. He only alleged the following: "I began to slice my arm until blood squirted all over the cell. C/o Dempsey stood and watched [and] then called his superior about the matter." [1 at p. 8.] Although plaintiff states here that Dempsey stood there *during* the cutting itself, plaintiff states that Dempsey "then" called his supervisor. The word "then" implies that the call was made right after the cutting. No time gap or delay is mentioned. You would expect that an allegation this significant—a guard callously watching someone bleeding profusely for five minutes—would be mentioned in the initial complaint, especially since it otherwise contains a lot of specific detail. The time gap was first mentioned in the amended complaint, which states: "After *some many minutes* passed, CO Dempsey spoke with his supervisor[.]" [14 at ¶ 14 (emphasis added).] Then, in plaintiff's deposition, he stated for the first time that the amount of time was five minutes. Here is that portion of his deposition:

> Q. [H]ow quickly did [Dempsey] go to the phone after he saw you cut yourself?
>
> A. He actually waited until he seen there was—he actually—he didn't—he didn't— he didn't speak to his supervisor. I say around about five.
>
> Q. Five minutes?
>
> A. Yeah.

Pl. Dep. at p. 24. However, just before this exchange, plaintiff described the encounter as follows: "He seen me self-harming. He still ain't—still ain't help. Then *afterwards*, when he—then afterwards, when he actually seen it, *that's when he helped*." *Id.* at 23-24 (emphasis added). This testimony, which is admittedly short and subject to interpretation, seems to revert back to the original allegation in the *pro se* complaints—namely, that Dempsey sought help *when* he "actually saw" the cut and bleeding. In other words, immediately.

In sum, the court has serious doubts about whether a reasonable jury could believe plaintiff's allegation about the five-minute delay. *See generally Catinella v. Cnty. of Cook*, 881 F.3d 514, 516 (7th Cir. 2018) (plaintiff's claims can be dismissed even at the pleading stage if he fails to present "a story that holds together"). But the court would not grant summary judgment if these were the only issues with plaintiff's allegations. *See generally McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 814 (7th Cir. 2017) (a plaintiff's testimony may not be disregarded on summary judgment solely because it is "self-serving, speculative, and conclusory"). However, in this court's view, plaintiff's case runs into a bigger—and ultimately impassable—roadblock when his allegations about the piece of metal are considered. This again requires us to untangle his changing positions over the course of this case.

In his two *pro se* complaints, plaintiff alleged that he showed Dempsey "a piece of sharp metal" on August 9th and, a week later, showed Castenado "a piece of metal." [Case No. 18-50373,

7

1 at p. 8; Case No. 18-50372, 1 at p. 6.] Several initial points to note. First, these allegations are vague in the sense that they do not describe the object in terms of any functional or commonplace object—*e.g.* a knife, razor, paperclip. For other encounters, plaintiff used these kinds of concrete descriptions. *See, e.g.*, Ex. A at 15 (plaintiff telling staff that he had "cut himself with a razor"); *see also id.* at 16 (referring to plaintiff's use of staples, paperclips, ball point pens to cut himself). Plaintiff has never, at any point in this lawsuit, described the object by using one of these run-of-the-mill descriptions.[5] Second, plaintiff here does not indicate, one way or another, whether it was the same piece of metal used in the two incidents.

In the amended complaint, which was drafted by appointed counsel, plaintiff added details about the physical dimensions of the objects. He alleged that the August 9th piece of metal was "approximately 2 inches by 1 1/2 inches" (¶ 9) and alleged that that the August 16th piece of metal was "approximately 1.5 inches long and 0.5 inches wide having a triangular shape and a sharp point" (¶ 20). In this court's view, the only reasonable way to read these two very precise descriptions is that plaintiff used *a different* piece of metal each time. And plaintiff in this complaint never stated that they were the *same* piece of metal. These allegations, standing on their own, are not obviously objectionable or wrong.

However, a big problem emerges when plaintiff's deposition testimony is considered. Plaintiff's deposition was the only one taken in this case by either side. The deposition was short, lasting just over an hour. And a decent portion of this time was spent re-asking questions or clarifying answers because plaintiff had, by his own admission, speech difficulties. The court has reviewed this deposition carefully. In this deposition, plaintiff testified that he used the "*exact same* piece of metal" for both incidents. Ex. 7 at p. 32 (emphasis added); *see also id.* at 44. Even though his testimony was vague on many other issues, he was quite clear on this assertion, stating it unequivocally two times. *Id.* This testimony was new and undoubtedly surprising to counsel when it emerged during the deposition because, first of all, it directly contradicted the allegations in the amended complaint. It also raised a question: how was plaintiff able to use the exact same piece of metal in two incidents a week apart? Plaintiff answered that, after he cut himself on August 9th, he hid the metal somewhere inside or around a vent in his cell (he was vague about precisely where) and that he retrieved the same object a week later and used it again to cut himself on August 16th. *Id.* at 32, 43-45. Plaintiff was clear that he hid the object *before* he was removed from his cell and was taken to the hospital to have his wound stitched up. *Id.* at 44 ("Q. By the time they got you out of the cell, did you already hide the piece of metal on August 9th, 2018? A. Yeah."). As noted above, it is undisputed that plaintiff's cell was searched after he was taken out of it, and no object was found. Defendants' position, again, is basically that plaintiff made up the story about

---

[5] One possible exception, which really only adds to the overall confusion. Defendants note that, according to hospital records, plaintiff told medical personnel at the hospital that night that "he used *a pen* to lacerate his right antecubital space." Ex. 4 at p. 52 (emphasis added). This appears to be the only instance where plaintiff (allegedly) described the piece of metal in terms of an everyday object. But plaintiff seems to deny making this statement, stating that he "in fact used *a sharp object* discovered in his cell." [139 at p. 5 (emphasis added)]. This is another example of how plaintiff's case depends on the claim that all the other witnesses (here, non-prison medical personnel) are lying or mistaken.

having *any* object.[6] If he had no object, then his suicide threat would have been less credible from the beginning.

After carefully reviewing this testimony, the court can find no way that any jury could reconcile it with plaintiff's other statements about what allegedly happened. For one thing, as discussed above, the deposition testimony that the same piece of metal was used for both incidents contradicts the allegations of the amended complaint. *See generally Moran v. Calumet City*, --- F.4th ---, 2022 WL 17173891, *6 (7th Cir. Nov. 23, 2022) ("An allegation in a complaint is a judicial admission that can be used against the plaintiff."). Plaintiff thus has told two different contradictory versions of what happened. In this court's view, this contradiction is material and casts doubt on all of his testimony. Moreover, plaintiff has offered no explanation, in either his deposition or in his response brief, as to why he changed his story. *See, e.g.*, *Patton v. MFS/Sun Life Fin. Distr.*, 480 F.3d 478, 488 (7th Cir. 2007) ("A number of scenarios might explain a change [in a litigant's position]: a confusing deposition question, circumstances indicating a lapse of memory, relevant new information discovered after the original testimony, or ambiguous or incomplete earlier testimony[.]") (cleaned up); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir. 1985) ("The situation is quite different when a plaintiff has directly contradicted her own earlier statements, without explaining the contradiction or attempting to resolve the disparity.").

Even if this court were to credit plaintiff's new "only one metal object" position, it would still be at odds with his prior statements. In all his complaints, both the two complaints he drafted *pro se* and the complaint counsel drafted, plaintiff has never alleged that he hid the metal object in the vent in his cell. Instead, he portrayed himself as sprawled out on the floor, incapacitated by heavy bleeding. He also has asserted that he was generally compliant and was not moving around spattering blood, as defendants have asserted. If he were not moving around, then how did he get up and go over to the vent to hide the object? Another sticking point. Many people were in the cell—including defendants Boel and Dempsey, another correctional officer, and two nurses. Plaintiff chose not to depose any of these individuals, but they gave statements in the IDOC internal investigation, and none of them mentioned any object being found in the cell. They also did not report ever seeing plaintiff go over by the vent, while they all watched or perhaps while they all averted their eyes, and carefully hide the object in (or somewhere around) that vent in what would have been an elaborate Houdiniesque game of hide and seek. Plaintiff had a history of suicide attempts. This was a crisis watch cell. It is plainly incredible to believe that these guards would have stood idly by and allowed him to hide a sharp object that could be used not only by him but by other suicidal inmates occupying the same cell. And why could these guards not then find that object when they searched the cell after plaintiff was taken from it?

For all these reasons, the court concludes that no reasonable jury could reconcile these multiple and contradictory stories into one coherent, or even arguably coherent, version of events that would be enough for a jury to rule in plaintiff's favor on his two § 1983 claims. The court

---

[6] If plaintiff lied about using a metal object, this would not be the first time, at least according to prison records. *See, e.g.*, Ex. A at p. 15 (in an incident on July 11, 2020, plaintiff was taken to the hospital after harming himself and told medical personnel there "that he had cut himself with a razor and swallowed it," but an X-ray did not show any razor in his body). It should be noted that plaintiff has raised a general objection that these records contain some hearsay evidence.

recognizes that the typical and strongly preferred way to resolve disputes such as the ones described above is to deny summary judgment and let the jury make the ultimate determination. But in some cases, and this court finds this to be one, summary judgment may be granted when a party's story is "blatantly contradicted" (in this case, by the party's own statements) such that "no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007);[7] *Rainer v. Lucksted*, 2022 WL 3213358 (E.D. Wisc. Aug. 9, 2022) (relying on *Scott*: "The plaintiff's version of events is blatantly contradicted by the record and no reasonable jury could believe, based on the record before the court, that the defendant deliberately gave the defendant thirty-five times the prescribed amount of Tylenol.").

There is one other issue to address, which is plaintiff's allegation that Boel was unjustified in using the pepper-spray one time against plaintiff. Here again, the court finds that plaintiff's contradictory allegations undermine his claim. The nub of this dispute is whether plaintiff was moving about causing blood to spatter on the people there. Plaintiff claims, in effect, that he was docile and compliant, not moving around. But if we accept plaintiff's testimony that, while the guards were watching him, he went over to the vent and hid the metal object, it follows that he was not obeying orders to stay still. Additionally, and separate from this point, plaintiff has admitted that blood, in fact, was "spattered" on Boel during this encounter. *See* Am. Cmplt. ¶15. Plaintiff only denies that any spattering was intentional. Even if it is true that plaintiff was not purposefully trying to spatter blood, Boel could have reasonably misconstrued plaintiff's actions and believed, even if it turned out to be incorrect, that plaintiff was acting aggressively, especially given his long history of doing so.

In conclusion, the court acknowledges the difficult competing considerations in this type of case. On the one hand, plaintiff is indisputably suffering from debilitating mental illnesses. When he threatens self-harm, officials must be vigilant. And when he injures himself, prison officials must provide appropriate treatment—whether or not plaintiff was engaging in manipulation and whether or not he was making a sincere suicide attempt. At the same time, plaintiff's behavior places a large burden on the institution as a whole. In their opening brief, defendants eloquently describe these concerns:

> It is clear from Plaintiff's records that he substantially strains the prison's correctional and medical resources on a regular basis. Defendants take seriously their responsibility to keep the prisoners in their custody safe from harm to the best of their abilities, but in a prison, where hundreds of inmates need various levels of care every day, it is simply impossible to attend to just one inmate at every moment that he demands attention, especially when it is occurring with the type of frequency that Plaintiff requests.

[125 at p. 8.]

---

[7] The court recognizes that this statement from *Scott* is most often relied upon in summary judgment cases where there is videotape evidence contradicting the plaintiff's account, which is not the case here. But the court is not aware of any authority strictly limiting this principle to that particular scenario.

After considering all the evidence presented by the parties, and after giving plaintiff the benefit of the doubt where reasonably possible, the court does not believe that any reasonable jury could find that these three individual defendants violated § 1983. For these reasons, defendants' motion for summary judgment is granted. The court thanks appointed counsel for their work representing plaintiff in this matter.

Date: 12/12/2022 ENTER:

*Philip G. Reinhard*
United States District Court Judge

Electronic Notices.